**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **ANTARESRE REINSURANCE COMPANY LIMITED, a Bermudian Company,** | § § § § | |
| **Plaintiff,** | § § | **CIVIL ACTION NO. 4:23-cv-00928-P** |
| **v.** | § § | |
| **NATIONAL TRANSPORTATION ASSOCIATES, INC. d/b/a NTA GENERAL INSURANCE AGENCY, a California Corporation; and SUPERIOR RISK MANAGEMENT, INC., a California Corporation,** | § § § § § § § § | |
| **Defendants.** | § § § § | |

## COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE, MARK T. PITTMAN:

COMES NOW, Plaintiff Antares Reinsurance Company Limited, formerly known as Qatar Reinsurance Company Limited (AntaresRe or Plaintiff herein), and alleges as follows:

## PARTIES

1.     Plaintiff is a corporation organized and existing under the laws of

Bermuda.

2.      Defendant National Transportation Associates, Inc. d/b/a NTA General Insurance Agency (NTA) is a corporation organized and existing under the laws of the State of California, with its principal place of business in Pleasanton, California. NTA is, and at all times relevant to this complaint was, a citizen of the State of California. NTA also maintains an office in Dallas, Texas.

3.      Defendant Superior Risk Management, Inc. (SRM) is a corporation organized and existing under the laws of the State of California, with its principal place of business in Pleasanton, California. SRM is, and at all times relevant to this complaint was, a citizen of the State of California. SRM also maintains an office in Westlake, Texas.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction under 28 U.S.C. section 1332 because AntaresRe and NTA are citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.      Venue is proper in this judicial district because NTA and SRM are subject to this Court's personal jurisdiction with respect to this instant action. SRM and NTA maintain offices in Westlake and Dallas, Texas, respectively. On September 7, 2023, the United States District Court for the Central District of California ordered this matter transferred to the Fort Worth Division of the United States District Court for the Northern District of Texas.

## FACTUAL ALLEGATIONS

### The Relationship between AntaresRe and NTA

6.      Non-party United Specialty Insurance Company (USIC) is an insurance company that offers policies of insurance for commercial automobile liability, among other things.

7.      NTA is a General Agent that provides underwriting services, claims

handling, and insurance products on behalf of AntaresRe, including for commercial transportation trucking businesses.

8.  SRM provides claims management services specializing in transportation, including commercial trucking, buses, and trains. SRM holds itself out as managing all phases of claims administration, including investigation, adjustment, negotiation, and litigation management.

9.  USIC and other affiliates and parties entered into a General Agency Agreement (GAA herein), a Quota Share Reinsurance Agreement (Quota Share Agreement) and various Interests and Liabilities Contracts with NTA effective May 1, 2017 (collectively, the Agreements).

10.  AntaresRe and other subscribing reinsurers are parties to the GAA and Quota Share Agreement. AntaresRe also entered into an Interests and Liabilities contract with USIC (and its affiliates) and NTA.

## The General Agency Agreement

11.  Under the General Agency Agreement, NTA agreed to perform all functions necessary for the production, service and management of policies issued on behalf of USIC and its affiliates, subject to the Quota Share Agreement in accordance with the terms and conditions set forth therein and in the GAA.

12.  USIC's appointment of NTA as its General Agent, at the request of AntaresRe and the other subscribing reinsurers, is memorialized in Section 1.01 of the GAA, as follows:

> [USIC], at the request of the Reinsurer, hereby appoints the General Agent as its general agent for the purpose of producing and handling the business which is the subject of the Reinsurance Agreement issued or renewed on or after the effective date of this Agreement. [USIC] hereby grants authority to the General Agent to solicit, accept and receive applications for such classes of coverage as are specified in the Reinsurance Agreement; to secure, at its

own expense, reasonable underwriting information through reporting agencies or other appropriate sources relating to each risk insured; to issue, renew and countersign policies, certificates, endorsements and binders which the Company may, from time to time, authorize to be issued, delivered, renewed and countersigned; and to collect and receipt for the premiums thereon and therefor.

13.    Section 1.03 of the General Agency Agreement requires NTA, at the request of AntaresRe and the other subscribing reinsurers, to perform all acts and duties required under the policies of insurance issued on behalf of USIC and its affiliates, and provides, in pertinent part, as follows:

[USIC] further authorizes [NTA] to perform all acts and duties under policies of insurance issued by [USIC] as would otherwise be performed by [USIC], including, but not limited to, properly sending and/or receiving reports and notices and remitting and/or receiving monies due from or to [USIC], and adjusting and paying losses or other claims. The Company grants to [NTA] the authority to settle claims on behalf of [USIC]. . . . [USIC] retains final authority to determine any disputes relating to claims settlement and setting of loss reserves. . . While there are acts of [NTA] which may be required by applicable law to be performed on behalf of [USIC], **[NTA] shall** remain ultimately responsible for such acts and will **indemnify and hold the Company completely harmless** for any damage, cost, liability, expense and/or loss (including attorneys' fees and expenses) incurred by [USIC] as respects such acts of [NTA]. [NTA] must send [USIC] a report, as soon as it becomes known, that a claim (i) involves a coverage dispute; (ii) involves a demand in excess of policy limits; (iii) alleges bad faith; (iv) is open for more than six months; or (v) alleges a violation of any applicable unfair practices and unfair competition statutes. [USIC] may suspend or terminate the settlement authority

of [NTA] during the pendency of any dispute regarding
any event of default by [NTA]. (Emphasis added.)

14.    Pursuant to Section 1.04 of the GAA, NTA was "authorized to have
claims adjusted through **independent** claims adjusters." (Emphasis added.) Section
1.04 provides that such independent claims adjusters retained by NTA "are not the
agents of [USIC] and [USIC] shall be held harmless and indemnified by [NTA] for
any liability, claim, demand, expense, and/or cost of whatever kind or character as
a result of, related to or connected with any action or inaction of such claims
adjusters."

15.    Section 2.01 of the GAA requires NTA to deposit all premiums it
collects on the business produced under the Quota Share Agreement in a premium
trust account, and expressly provides that the funds therein are owned by USIC:

All premiums collected by the General Agent [NTA] on
the business produced under the [Quota Share Agreement]
shall be deposited in a premium trust account. Despite the
General Agent's ownership of the account, funds deposited
therein on behalf of [USIC] are understood to be owned by
[USIC] and the account shall be maintained by the General
Agent in a **fiduciary capacity** separate and apart from any
operating or other funds of the General Agent and
furthermore shall be separate and apart from any other
funds maintained by the General Agent on behalf of any
other entity or person. The only disbursements from such
account shall be the payment of claims, claim expenses,
return premiums, commission due the General Agent as
authorized herein and in the [Quota Share Agreement],
and remittance of premiums to [USIC] …. (Emphasis
added.)

16.    Section 2.05 of the GAA requires NTA to "remit to [the subscribing
reinsurer(s) or USIC] as applicable, any funds of or due to [USIC] under [the
GAA] within forty-five days from the end of the month in which the premium is
recorded."

17.    Section 2.06 of the GAA provides that, "[NTA] shall hold all funds of or due [USIC] in a fiduciary capacity."

18.    Section 5.01 of the GAA provides that, NTA "shall, at all times during the period of this Agreement, comply with all applicable laws and all orders, policy decisions or other requirements of the Texas Department of Insurance or other applicable state insurance department," which includes California Department of Insurance Code Section 790.03(h)(5) and Regulations, Title 10 Section 2695.7(d) and (g).

19.    Section 5.02 of the GAA requires NTA to make its books, records, accounts, documents, and correspondence pertaining to USIC and the subscribing reinsurers' businesses **open to examination by any authorized representative of USIC or the subscribing reinsurer(s) at all times**:

> All books, records, accounts, documents and correspondence of [NTA] and any producing agent pertaining to [USIC's and the subscribing reinsurers'] business shall, at all times, be open to examination by any authorized representative of [USIC or the subscribing reinsurer(s)]. [NTA] shall make copies of records available upon request by [USIC or the subscribing reinsurer(s)], whether such request is before or after termination of this Agreement or the Reinsurance Agreement. [NTA] must maintain separate records of business, including, but not limited to, underwriting files for each insurer for whom it acts as a general agent. Such records must be maintained for five (5) years or until the completion of a financial examination by the insurance department of the state in which [USIC] is domiciled, whichever is longer.

20.    Section 5.05 of the GAA requires NTA to account for and furnish, upon request with reasonable notice, complete copies of all policies issued, and copies of all claim files, as follows:

[NTA] shall account for and furnish to [USIC], upon request with reasonable notice, complete copies of all policies issued, copies of all spoiled, voided or otherwise unissued policies, and copies of all claim files created with respect to all loss occurrences under any policy issued under this Agreement.

21.     Section 5.06 of the GAA requires NTA to provide, upon request, electronic copies of any and all data related to the reinsured business:

Upon request of [USIC], prior to or after the termination of this Agreement, [NTA] shall provide to [USIC], at [NTA's] sole cost and expense, electronic copies of any and all data related to the reinsured business **in a format specified by [USIC]**. Further, [NTA] shall ensure any vendor or other third party acknowledges and agrees [USIC], at no expense to [USIC], shall have use of any systems, data, information, reports, files or statistics prior to or after the termination of this Agreement. (Emphasis added.)

22.     Section 5.08 of the GAA requires NTA to provide USIC with data from all electronic claim files within thirty (30) days or less if requested by USIC.

23.     Section 9.08 of the GAA provides that, in the event the amount of any claim or counterclaim against NTA is in excess of five hundred thousand ($500,000), including in such calculation all amounts of compensatory and punitive damages, such claim or counterclaim shall not be subject to arbitration, and litigation shall be the sole remedy for any such claim. AntaresRe's claim against NTA is well in excess of $500,000; thus, pursuant to Section 9.08 of the GAA, AntaresRe hereby elects to pursue litigation against NTA in this Court.

## The Quota Share Agreement

24.     The Quota Share Agreement provides that NTA is appointed as the general agent for the purpose of producing and handling the business that is the subject of the contract.

25.     Section 1.03 of the Quota Share Agreement states in relevant part as follows:

> [USIC] further authorizes the General Agent to perform all acts and duties under policies of insurance issued by [USIC] as would otherwise be performed by [USIC], including, but not limited to, properly sending and/or receiving reports and notices and remitting and/or receiving monies due from or to [USIC], and adjusting and paying losses or other claims. The Company grants to the General Agent the authority to settle claims on behalf of [USIC].

26.     Sections 1.03 and 5.02 of the Quota Share Agreement further define NTA's delegated authority and duties:

> [USIC] has appointed [NTA] as its general agent for the purpose of producing and handling the business which is the subject of this Contract. . . . [USIC] has further authorized [NTA] to perform all acts and duties. . . as would otherwise be performed by [USIC], including, but not limited to, properly sending and/or receiving reports and notices and remitting and/or receiving monies due from or to [USIC], and adjusting and paying losses or other claims. [USIC] has granted to [NTA] the authority to settle claims on behalf of [USIC]. . . .

27.     Section 5.03 of the Quota Share Agreement empowers NTA "to accept notice of and investigate any claim arising under any of the Policies, to pay, adjust, settle, resist or compromise any such claim, unless [USIC] specifically directs to the contrary with respect to any individual claim" and requires NTA to "exercise the authority granted [t]hereunder in good faith and toward the end of paying any and all valid claims."

28.     Section 5.04 of the Quota Share Agreement **requires NTA to make available to [USIC and AntaresRe] all records pertaining to claims** arising under insurance policies subject to the Quota Share Agreement, as follows:

All records pertaining to claims arising under insurance policies issued on behalf of [USIC] through or by the General Agent subject to this Agreement shall be deemed to be **jointly owned records of [USIC] and the Reinsurer**, and shall be made available to [USIC and the subscribing reinsurer(s)] or their respective representatives or any duly appointed examiner for any state within the United States; and these records shall be kept in the State of California or such other jurisdiction as may be required by applicable state law or regulation. (Emphasis added.)

29.    Pursuant to Section 5.05 of the Quota Share Agreement, NTA is required to establish and maintain a claim register in a manner that allows the determination of the status of any claim arising out of any policies issued under the Agreements:

[NTA] shall establish a separate claim register or method of recording claims arising under the Policies covered by this Agreement so that all claims may be segregated and identified separate and apart from other records of the Reinsurer or [NTA], with such claims register **to identify each claim on an individual case basis both as to identify the insured(s) and the claimant, the reserve for loss and adjusting expense**. Such claim register shall be kept in a manner whereby [USIC] can, at any time, determine the status of any claim arising under Policies covered by this Agreement. Such records shall reflect the amount of reserves established for the individual claim and the date when such reserve was established, and if closed, whether such claim was closed with or without payment, and if with payment, the amount paid thereon. (Emphasis added.)

30.    Section 6.04 of the Quota Share Agreement **requires** NTA to advise USIC and AntaresRe of claims that fall within the following categories:

1.    Are reserved for an amount in excess of $100,000;
2.    Originate from the following kinds of bodily injury:

    a. Brain injuries resulting in impairment of physical function;

    b. Spinal injuries resulting in a partial or total paralysis of upper or lower extremities;

    c. Amputation or permanent loss of use of upper or lower extremities;

    d. Severe burn injuries;

    e. Loss of sight in one or both eyes;

    f. All other injuries likely to result in a permanent disability rate of 50% or more; and

    g. Fatalities.

31. Section 8.05 of the Quota Share Agreement governs NTA's commission structure, and provides that the provisional commission allowed to NTA shall be calculated, adjusted and applied to the ceded premiums earned for each agreement year in accordance with the provisions set forth below:

    (i) If the ratio of losses incurred to premiums earned is 66% or greater, the adjusted commission rate for the period under consideration shall be 25%.

    (ii) If the ratio of losses incurred to premiums earned is less than 66%, but not less than 57%, the adjusted commission rate for the period under consideration shall be 25%, plus 100% of the difference in percentage points between 66% and the actual ratio of losses incurred to premiums earned.

    (iii) If the ratio of losses incurred to premiums earned is less than 57%, but not less than 45% the adjusted commission rate for the agreement year under consideration shall be 34% plus 50% of the difference in percentage points between 57% and the actual ratio of losses incurred to premiums earned up to a maximum commission of 40% at a loss ratio of 45%.

32. Section 8.05 of the Quota Share Agreement provides additional detail as to the provisional commission:

    If the ratio of losses incurred to premiums earned for any period is greater than 66%, the difference in percentage

points between the actual ratio or losses incurred to premiums earned and 66% shall be multiplied by premiums earned for the period and the product shall be carried forward to the next adjustment period as a debit (additional) to losses incurred. If the ratio of losses incurred to premiums earned for any period is less than 45%, the difference in percentage points between 45% and the actual ratio of losses incurred to premiums earned shall be multiplied by premiums earned for the period and the product shall be carried forward to the next adjustment period as a credit to losses incurred. Such credits/deficits shall not carry forward for more than two (2) years.

33.    Section 8.05 of the Quota Share Agreement provides NTA with additional requirements as to the provisional commissions:

The General Agent shall calculate and report the adjusted commission on ceded premiums earned within 60 days after 24 months after the end of each agreement year, and within 60 days after the end of each 12-month period thereafter until all losses subject hereto have been fully settled. If the adjusted commission on ceded premiums earned is less than commissions previously allowed by the Reinsurer on ceded premiums earned for the agreement year, **the General Agent shall remit the difference to [the subscribing reinsurers]** with its report.… (Emphasis added.)

34.    Section 8.05 of the Quota Share Agreement provides that NTA must remit provisional commissions following the final adjustment period:

As respects the final adjustment period, the General Agent shall calculate and report the adjusted commission on premiums earned within ninety (90) days after the date of termination, and within ninety (90) days after the end of each twelve (12) month period thereafter until all losses subject hereto have been finally settled. Each such calculation shall be based on cumulative transactions hereunder from the beginning of the final adjustment

period through the date of adjustment. If the adjusted commission on premiums earned for the final adjustment period as of the date of adjustment is less than commissions previously allowed by the Reinsurer on premiums earned for the same period, the General Agent shall remit the difference to the Reinsurer with its report.…

35.    Section 8.05 of the Quota Share Agreement defines "losses incurred" as the balance of the following:

(i)    Ceded losses and loss adjustment expenses paid as of the effective date of calculation; plus

(ii)    The ceded reserves for losses and loss adjustment expenses outstanding as of the effective date of calculation;

(iii)    Plus (minus) the debit (credit) from the preceding agreement year as set forth in paragraph (b) above except that such credits/deficits shall not carryforward more than two (2) years; plus

(iv)    Any assignments and/or assessments as set forth in Section XI of the [Quota Share] Agreement.

36.    Article IX of the Quota Share Agreement provides that, "[AntaresRe] or its duly appointed **representatives shall have free access at any and all reasonable times to such books and records of the General Agent**, and its departmental or branch offices as shall reflect premium and loss transactions of [USIC] and/or the business produced hereunder, for the purpose of obtaining any and all information concerning [the Quota Share] Agreement or the subject matter hereof." (Emphasis added.)

37.    For the 2017 agreement year, NTA received a provisional commission of 31% of premiums earned.

38.    For the 2018 agreement year, NTA received a provisional commission of 32% of premiums earned.

39.     For the 2019 agreement year, NTA received a provisional commission of 31% of premiums earned.

40.     Section 18.06 of the Quota Share Agreement provides that, "[w]here [NTA] retains claims handling authority, [NTA] warrants that it will assess and administer claims in a reasonable, good-faith and business-like manner, acting always in accordance with statutory laws and regulations."

<strong>The Interests and Liabilities Contracts</strong>

41.     The executed signatures on behalf of USIC and its affiliates, NTA, and AntaresRe that bind the parties to the GAA and Quota Share Agreement appear on the Interests and Liabilities Contracts attached to the GAA and Quota Share Agreement.

<strong>The Claims Adjusting Agreement</strong>

42.     Pursuant to authority conveyed to NTA under Section 1.04 of the GAA, effective May 1, 2017, NTA entered an Agreement for Claims Administration and Adjusting Services (Claims Adjusting Agreement), which allows SRM to act on behalf of NTA in the management, investigation, adjustment of claims, and management of litigation against USIC insureds, and the settlement of claims within USIC policy limits.

43.     AntaresRe is informed and believes that SRM and NTA are affiliates that share common ownership and management, and NTA did not disclose this relationship to AntaresRe prior to initially entering into the Agreements.

44.     Pursuant to the Claims Adjusting Agreement and applicable law, SRM had the duty and responsibility to diligently manage, investigate, adjust and settle all claims on behalf of USIC in compliance with all policies, applicable laws and SRM's Claims Handling Guidelines. The duties and responsibilities of SRM under the Claims Adjusting Agreement and the Claims Handling Guidelines include the following obligations, among others:

a.  Record, establish and adequately maintain a file for the claim (Sections III.A. and B.1; Claims Handling Guidelines Chs. 1, 4, and 5.)

b.  Establish and maintain appropriate reserves for the claim based on a continuing claim investigation and evaluation (Section III.B.3; Claims Handling Guidelines Chs. 1, 2, 4 and 5.)

c.  Provide adequate management control to ensure ongoing implementation of the reserve review process (Section III.B.4; Claims Handling Guidelines Ch. 2.)

d.  Advise upon receipt of any claim over $100,000 or claims involving brain injuries (Section III.B.6-8; Claims Handling Guidelines Chs. 2, 4-5.)

e.  Advise of any plaintiff's settlement demand in excess of policy limits or any alleged bad faith.

f.  Independently manage assigned defense counsel.

g.  Attend all court-mandated hearings and settlement conferences.

h.  Pay, adjust, settle, resist or compromise any claim arising under any of the policies issued pursuant to the Agreements in good faith and toward the end of paying any and all valid claims.

i.  Comply with all applicable laws and all orders, policy decisions or other requirements of applicable state insurance departments including but not limited to California Department of Insurance Code Section 790.03(h)(5) and Regulations, Title 10 Section 2695.7(d) and (g).

**NTA and SRM's Repeated Refusal to Permit Inspection**

45.  AntaresRe made numerous requests to inspect and make copies of NTA's "books, records, accounts, documents and correspondence." NTA and SRM have refused to provide the requested documents, and have failed and refused to make the requested documents available for inspection and copying.

46.  AntaresRe similarly requested, on numerous occasions, access to

"[a]ll records pertaining to claims arising under insurance policies issued on behalf of [Antares] through or by [NTA] subject to [the Quota Share] Agreement." NTA has failed and refused to make the requested documents available for inspection and copying.

47.    AntaresRe made requests for electronic copies of data related to the reinsured business. NTA has failed and refused to provide electronic copies of claims files and other data requested.

48.    On April 28, 2020, AntaresRe wrote to broker Guy Carpenter advising of AntaresRe's intent to audit NTA's files. On May 13, 2020, AntaresRe's outside counsel, Wilson, Elser, Moskowitz, Edelman & Dicker (Wilson Elser), wrote to Yogesh Kumar, NTA's President, and informed him that AntaresRe was exercising its right to audit the insurance program, requesting access to the electronic files as soon as possible, and requesting access to visit the claims facility to review any paper files. On June 2, 2020, AntaresRe's General Counsel, wrote to Timothy Halloran, counsel for NTA and SRM, requesting both an in-person and electronic claim audit of all files in the NTA program. On June 4, 2020, Attorney Halloran responded to AntaresRe's request for both an in-person and electronic claim audit, advising that SRM would allow an audit with 30 days' notice, as long as AntaresRe's chosen counsel, Wilson Elser, would not be involved in the audit. In addition, NTA and SRM added the condition "that the entire audit be physically performed in their Pleasanton, CA office."

49.    On July 9, 2020, AntaresRe wrote to Timothy Halloran, advising again that AntaresRe previously informed NTA that it was exercising its auditing rights under the Quota Share Agreement, explaining that AntaresRe is contractually entitled to copies of NTA's books, records, accounts, documents and correspondence, without limitation or condition. AntaresRe informed Mr. Halloran in the correspondence that NTA's unilateral condition that the entire audit be

physically performed on its Pleasanton, California location was denied.

50.    NTA failed to respond to AntaresRe's July 9, 2020 correspondence. On July 21, 2020, AntaresRe sent a Fourth Request for an NTA audit to Tim Halloran, noting that NTA and SRM refused AntaresRe's request that it be permitted to send an in-person copy service to obtain copies of the applicable files. AntaresRe's letter outlined the three prior communications that sought reasonable access to audit the insurance program and to receive copies of the books and records pertaining to it. AntaresRe never received a response to its July 21, 2020 letter.

51.    On November 2, 2020, AntaresRe transmitted additional correspondence to Mr. Kumar and Guy Carpenter, stating that over the prior seven months, AntaresRe had repeatedly requested copies of NTA's "books, records, accounts, documents and correspondence" pursuant to Section 5.02 of the GAA, offering to send a copy service to the SRM offices. AntaresRe noted that only way NTA would allow review of the files was to physically review them in its California offices in the middle of a global pandemic. AntaresRe stated that the claims files and accounting records were absolutely necessary, and AntaresRe was formally exercising its right under Section 5.02 of GAA to examine NTA's premium trust account records. AntaresRe formally demanded complete and immediate access to NTA's premium trust account records no later than Wednesday, November 6, 2020 at 12:00 p.m. PST, advising that NTA was contractually obligated to provide all such information and documentation upon request, per Section 5.04 of the QSRA. In the correspondence, AntaresRe renewed its demand for NTA's and SRM's claim files, demanding complete access to all SRM electronic claim files no later than Wednesday, November 4, 2020.

52.    In March 2023, Simon Catt, Claim Director for AntaresRe, wrote to Guy Carpenter and requested a meeting between NTA and AntaresRe to discuss

significant claims. The correspondence contained a list of claims for the discussion. On March 16, 2023, Guy Carpenter wrote to NTA about the request, enclosing the correspondence from AntaresRe. On April 5, 2023, Mr. Kumar responded in writing to Guy Carpenter and said that the ten claims files requested in the March 2023 request would be made available to AntaresRe at a "reasonable time" at NTA's Pleasanton offices "or as otherwise may be arranged." Mr. Kumar noted that AntaresRe had stated in recent court filings that it had made multiple requests to invoke its rights under the QSR Agreement and the General Agency Agreement, but that NTA was unaware of any such prior request by AntaresRe. Mr. Kumar asserted that NTA had never refused to make its books and records available and stated it would do so, at its Pleasanton offices, upon ten days' notice.

53.     On May 3, 2023, Mr. Linsao wrote a letter responding to Mr. Kumar's April 5, 2023 letter, outlining the numerous previous requests for the claims files, books and records. Mr. Linsao reminded Mr. Kumar that NTA had refused to: provide the electronic copies of the files; allow AntaresRe to copy the paper files by using a professional copy service; allow AntaresRe's chosen representative to participate in the review of files; and to provide access to the premium trust account and loss fund records. Mr. Linsao responded that Mr. Kumar's offer to make available ten specific claims files for review on location at NTA's Pleasanton, California did not address AntaresRe's concerns. Mr. Linsao pointed out that NTA had ignored repeated requests for other documents and for NTA to provide access to both electronic and paper claims files for the approximately 249 open claims, and 2,624 closed claims (25% of the closed claims) on a list AntaresRe would provide for Years of Account 2017, 2018 & 2019, Mr. Linsao noted that NTA had likewise ignored AntaresRe's requests for all premium trust account and loss fund records for those years of account, both electronic and paper. The May 3, 2023 letter requested that the open claim files be made available for inspection no later

than May 15, 2023, that paper and electronic files be made available to AntaresRe's designated copy service at least three days before the date of inspection, production of 25% of the closed files in writing no later than May 8, 2023, and production of the records for the premium trust account and loss account for the Years of Account 2017, 2018, and 2019.

54.    Following the May 3, 2023 letter, AntaresRe's and NTA's attorneys communicated about the request for an audit, which specifically sought copies of the claim files and NTA's books and records, including those relating to the premium trust account and loss fund account. NTA has refused to allow a virtual audit even though it allowed another reinsurer of the program virtual access. NTA has produced limited documents from a Bank of America account, which purportedly is a loss fund account.

55.    AntaresRe hired an independent claims adjuster to perform a physical audit at NTA's Pleasanton's offices. That adjuster has gone to the Pleasanton location on two occasions, on August 22, 2023 and September 9, 2023. The adjuster was told by NTA and SRM that there was no way to copy the electronic data, nor could the adjuster print any documents. NTA agreed to provide one laptop for remote access to claim file information for the first time at that September 9, 2023 audit. No laptop was provided, nor have they uploaded promised additional claim files for review.

### NTA's and SRM's Fraudulent Scheme to Manipulate "Losses Incurred"

56.    On information and belief, NTA and SRM have engaged in a fraudulent scheme to manipulate "losses incurred" in order to avoid triggering reductions to NTA's provisional commissions as provided in Section 8.05 of the Quota Share Agreement.

57.    On information and belief, NTA and SRM carried out their fraudulent scheme by intentionally under-reserving losses and loss adjustment expenses, both

of which are included within the definition of "losses incurred" under Section 8.05 of the Quota Share Agreement.

58.    On information and belief, rather than pay claims indisputably owed, NTA and SRM under-reserved the claims and incurred relatively significant amounts to defend the claims rather than appropriately reserve and pay the claims.

59.    NTA also failed to appropriately acknowledge large payments in order to avoid triggering the reductions to NTA's provisional commissions.

60.    On information and belief, by under-reserving losses and loss adjustment expenses, and by failing to appropriately record large payments of the Reinsurer, NTA and SRM have fraudulently increased the ratio of losses incurred to premiums earned. NTA has profited from this scheme by receiving artificially inflated provisional commissions.

61.    As an example, NTA and SRM were aware that a lawsuit entitled *Cuevas, et al. v. Rai Transport, et al.*, Superior Court of California, County of Kern, Metropolitan Division under Case No. BCV-18-100615-SDS (Cuevas Action) involved allegations of traumatic brain injuries. Nonetheless, SRM assigned indemnity reserves of $3.00 each for the three plaintiffs, for a total indemnity reserve of $9.00.

62.    During the course of the Cuevas Action, SRM sent various large loss reports to NTA and NTA's Intermediary identified in the Quota Share Agreement, which omitted, and/or misrepresented information that NTA was required to provide under the Agreements. Large loss reports are completed by Gary Glenn of SRM, and then are forwarded to Yogesh Kumar, the principal of both SRM and NTA, for his review. The Large Loss Reports either misrepresented the nature of the injuries or omitted critical factual information, such as the fact plaintiffs had made policy limits demands (two of them), which SRM had rejected.

63.    Trial of the Cuevas Action commenced in in late November 2019. NTA and SRM failed to notify USIC and/or AntaresRe that they had authorized a stipulation to liability and failed to notify USIC and/or AntaresRe of the commencement of trial, and then failed to monitor, request and receive daily reports from counsel as required by SRM's Litigation Management Guidelines. Trial resulted in a verdict of $70,578,289.00 rendered against Rai, which the trial court later reduced to a Second Amended Judgment on Special Verdict in the amount of $67,275,370.66 (Cuevas Verdict).

64.    AntaresRe's first notice of the outcome of the Cuevas Action trial and the assertion by the Cuevas Plaintiffs that AntaresRe and the other subscribing reinsurers would be responsible for the Cuevas Verdict was not until after the jury in the Cuevas Action rendered its verdict.

65.    Even though the policy was subject to a "per accident" single liability limit of $1 million, the Cuevas Plaintiffs claimed that USIC, through AntaresRe and the other subscribing reinsurers, was obligated to pay the entire Judgment, post-judgment interest accruing in the amount of $6,727,537 per year, and an unspecified amount for punitive damages due to the alleged bad faith failure to accept a policy limit demand on behalf of the insureds.

66.    On or about November 13, 2020, after making demands that NTA and SRM settle the Cuevas Action, USIC settled the all pending litigation with the Cuevas Plaintiffs for a confidential amount funded entirely by AntaresRe and the other subscribing reinsurers, which was well in excess of the jurisdictional limit of this Court.[1] NTA refused to acknowledge that the settlement was part of the program and refused to consider it in calculating the loss ratio.

---

[1] The terms of the settlement with the Cuevas Plaintiffs are confidential, however, the fully executed settlement agreement and release memorializing the terms of settlement have previously been provided to SRM and NTA and can be lodged with the Court conditionally under seal at the appropriate time if necessary.

COMPLAINT – PAGE 20

## NTA's Refusal to Return Commissions on Ceded Premiums

67.    The settlement of the Cuevas Action is a "loss incurred" under the 2017 Agreements. The settlement of the Cuevas Action has significantly altered NTA's ratio of losses incurred to premiums earned, such that NTA's provisional commission of 31% was required to be adjusted downward to 25%.

68.    Moreover, pursuant to the loss deficit carryforward provisions of Section 8.05 of the Quota Share Agreement, NTA's 2018 provisional commission of 32% should be adjusted downward to 21%, and its 2019 provisional commission of 31% should be adjusted downward to 24%. Section 8.05 of the Quota Share Agreement requires NTA to remit to the Reinsurer the difference between the provisional commissions and the adjusted commissions. Based on the adjustments referenced above, NTA is required to remit more than $8,000,000. AntaresRe has made demands that NTA remit that amount, but NTA has refused to do, in violation of the Quota Share Agreement.

## NTA's and SRM's Fraudulent Use of a Fabricated Claimant
## and Claim Number to Conceal Information From Antares

69.    Beginning in or around March 2020, NTA and/or SRM began reporting a liability claim to AntaresRe and other reinsurers allegedly involving "John Smith Trucking," identified as purported claim number H32445 (John Smith Trucking Claim).

70.    From March 2020 to the present, NTA and/or SRM has submitted expenses under the John Smith Trucking Claim to AntaresRe and the other reinsurers for payment and/or reimbursement.

71.    From March 2020 to the present, AntaresRe and the other reinsurers have paid to NTA and/or SRM at least $760,047.24 for expenses allegedly incurred in the John Smith Trucking Claim.

72.    On information and belief, John Smith Trucking is a non-existent

COMPLAINT – PAGE 21

entity for whom NTA did <u>not</u> produce a policy of insurance on behalf of USIC and its affiliates.

73.    In or around October 2022, AntaresRe discovered that NTA and/or SRM had set up the John Smith Trucking Claim as a "companion file" to the claim that NTA and/or SRM had set up for Rai Transport, Inc. in the Cuevas Action (Rai Transport Claim).

74.    AntaresRe has also discovered that NTA and/or SRM used the John Smith Trucking Claim to fraudulently conceal unfavorable information, facts and/or evidence about the Cuevas Action from the reinsurers with respect to NTA's and/or SRM's underwriting of the policy issued to Rai Transport, Inc., the handling of the Rai Transport Claim, among others.

75.    Additionally, NTA and/or SRM utilized the John Smith Trucking Claim to submit for payment or reimbursement from AntaresRe and the reinsurers' invoices generated by NTA's and SRM's defense counsel in litigation USIC pursued against NTA and SRM related to the Cuevas Action. AntaresRe and the other reinsurers made payments for these invoices totaling at least $105,000.

## FIRST CAUSE OF ACTION

### Breach of Contract – Specific Performance

### (Against NTA and SRM)

76.    AntaresRe refers to and incorporates herein by reference each and every allegation set forth above as if set forth here in full.

77.    The General Agency Agreement and Quota Share Agreement are valid and existing contracts.

78.    NTA has breached the General Agency Agreement and the Quota Share Agreement, including by repeatedly failing and refusing to allow examination of NTA's books, records, accounts, documents, correspondence, policies issued, spoiled, voided or otherwise unissued policies, claim files, and

underwriting files, in violation of the express requirements set forth in Sections 5.02, 5.05, 5.06, and 5.08 of the General Agency Agreement and Section 5.04 of the Quota Share Agreement or to provide copies of the records as required by those agreements. NTA's demand that AntaresRe physically audit the files in Pleasanton, California has made it practically impossible and financially prohibitive to perform the audit.

79.     AntaresRe has complied with its obligations under the General Agency Agreement and the Quota Share Agreement.

80.     AntaresRe has no other adequate remedy at law. Accordingly, AntaresRe seeks specific performance of the requirements set forth in Sections 5.02, 5.05, 5.06, and 5.08 of the General Agency Agreement and Section 5.04 of the Quota Share Agreement.

81.     AntaresRe is entitled to an award of attorneys' fees and costs incurred in bringing this action pursuant to Article VII and Sections 1.03 and 1.04 of the General Agency Agreement, and pursuant to Section 15.08 of the Quota Share Agreement, and applicable law.

## SECOND CAUSE OF ACTION

### Breach of Contract - Reimbursement

### (AntaresRe v. NTA)

82.     AntaresRe refers to and incorporates herein by reference each and every allegation set forth above as if set forth here in full.

83.     NTA received provisional commissions under the Quota Share Agreement of 31%, 32%, and 31% for agreement years 2017, 2018, and 2019, respectively.

84.     Following the settlement of the Cuevas Action, which fell under the 2017 agreement year, NTA's provisional commissions should be adjusted downward to 25% for 2017, 21% for 2018, and 24% for 2019.

85.    NTA is required under Section 8.05 of the Quota Share Agreement to remit to the reinsurer the difference between the provisional commissions and the adjusted commissions. For agreement years 2017 through 2019, NTA's adjusted commissions are more than $8,000,000 less than its provisional commissions with respect to Antares.

86.    NTA has failed and refused to remit the amounts owed in breach of Section 8.05 of the Quota Share Agreement.

87.    As a direct and proximate result of NTA's breaches of Section 8.05 of the Quota Share Agreement, AntaresRe has sustained, and will continue to sustain, damages in an amount to be proven at trial.

88.    AntaresRe is entitled to an award of attorneys' fees and costs incurred in bringing this action pursuant to Article VII and Sections 1.03 and 1.04 of the General Agency Agreement, and pursuant to Section 15.08 of the Quota Share Agreement, and applicable law.

## THIRD CAUSE OF ACTION

### Demand for Accounting

### (AntaresRe v. NTA)

89.    AntaresRe refers to and incorporates herein by reference each and every allegation set forth above as if set forth here in full.

90.    On information and belief, NTA has failed to maintain a premium trust account under the terms set forth in Section 2.01 of the General Agency Agreement, including by failing to maintain the funds deposited into the premium trust account separate and apart from any operating or other funds of NTA, separate and apart from NTA's operating or other funds, and/or by making personal use of funds in the premium trust account.

91.    NTA has repeatedly failed and refused to provide AntaresRe with information and records pertaining to the premium trust account and AntaresRe's

funds therein. An accounting is therefore necessary as the information necessary to determine whether NTA has complied with its obligations under Section 2.01 of the General Agency Agreement is within the exclusive knowledge of NTA.

92.    AntaresRe is entitled to attorneys' fees and costs incurred in bringing this action pursuant to Article VII and Sections 1.03 and 1.04 of the General Agency Agreement, and pursuant to Section 15.08 of the Quota Share Agreement, and applicable law.

## FOURTH CAUSE OF ACTION

### Fraudulent Misrepresentation

### (AntaresRe v. NTA and SRM)

93.    AntaresRe refers to and incorporates herein by reference each and every allegation set forth above as if set forth here in full.

94.    By artificially manipulating loss amounts, NTA and SRM have made numerous material misrepresentations to AntaresRe. Specifically, NTA and SRM have significantly under-reserved claims involving serious injuries, including traumatic brain injuries, in order to create a more favorable ratio of losses incurred to premiums earned.

95.    NTA and SRM had knowledge of the falsity of their misrepresentations. In the case of the Cuevas Plaintiffs, SRM was aware as early as April 13, 2018 that the Cuevas Action involved allegations of traumatic brain injuries. Less than two months later, SRM assigned indemnity reserves of $3.00 for each of the Cuevas Plaintiffs, for a total indemnity reserve of $9.00. SRM did not adjust the indemnity reserves until more than a year later, on September 9, 2019, to a total of $160,000, which was still woefully inadequate.

96.    SRM and NTA also knowingly failed to disclose material information in large loss reports, including that the Cuevas Plaintiffs had made settlement demands that SRM and NTA unilaterally rejected. Large loss reports are prepared

COMPLAINT – PAGE 25

by SRM and reviewed by Yogesh Kumar, the principal of both SRM and NTA.

97.    SRM and NTA intended to induce AntaresRe to rely on their misrepresentations and failure to disclose, in order to receive higher provisional commissions under the Quota Share Agreement than NTA was actually owed.

98.    AntaresRe justifiably relied on SRM's and NTA''s misrepresentations and has been damaged as a result thereof. Moreover, AntaresRe seeks an award of punitive damages as a result of SRM's and NTA's fraud.

99.    AntaresRe is entitled to an award of attorneys' fees and costs incurred in bringing this action pursuant to Article VII and Sections 1.03 and 1.04 of the General Agency Agreement, and pursuant to Section 15.08 of the Quota Share Agreement, and applicable law.

## FIFTH CAUSE OF ACTION

### Fraud

### (AntaresRe v. NTA and SRM)

100.    AntaresRe refers to and incorporates herein by reference each and every allegation set forth above as if set forth here in full.

101.    NTA and/or SRM have made material misrepresentations to AntaresRe through their creation and use of the John Smith Trucking Claim as a "companion file" to the Rai Transport Claim.

102.    Specifically, NTA and/or SRM fabricated the John Smith Trucking Claim for the purpose of fraudulently concealing from AntaresRe unfavorable information, facts and/or evidence about the Cuevas Action.

103.    NTA and/or SRM also fabricated the John Smith Trucking Claim to fraudulently submit expenses to AntaresRe for payment and/or reimbursement, many of which were not related to the Cuevas Action and/or were not proper expenses subject to reimbursement under the terms of the GAA and/or the Quota Share Agreement.

COMPLAINT – PAGE 26

104.   NTA and/or SRM intended to induce AntaresRe to refrain from acting on the concealed information, and further intended to induce AntaresRe to make payments to NTA and/or SRM that were not subject to payment and/or reimbursement under the terms of the GAA and/or the Quota Share Agreement.

105.   AntaresRe justifiably relied on SRM's and NTA's misrepresentations and has been damaged as a result thereof. Moreover, AntaresRe seeks an award of punitive damages as a result of SRM's and NTA's fraud.

106.   AntaresRe is entitled to an award of attorneys' fees and costs incurred in bringing this action pursuant to Article VII and Sections 1.03 and 1.04 of the General Agency Agreement, and pursuant to Section 15.08 of the Quota Share Agreement, and applicable law.

## SIXTH CAUSE OF ACTION

### Declaratory Relief

### (AntaresRe v. NTA)

107.   AntaresRe refers to and incorporates herein by reference each and every allegation set forth above as if set forth here in full.

108.   An actual, justiciable controversy within this Court's jurisdiction exists between AntaresRe on the one hand and NTA on the other hand concerning their rights and obligations under the General Agency Agreement and the Quota Share Agreement. This Court has authority to issue a judgment for declaratory relief concerning the Parties' respective rights and duties.

109.   The Parties are adverse, AntaresRe has a legally protectable interest in the controversy, and the issues are ripe for judicial determination. The requested judicial determination is appropriate and necessary to resolve a present controversy by defining the respective rights and obligations of the Parties. No other adequate remedy exists by which the rights of the Parties may be determined.

110.   Based on the foregoing, AntaresRe seeks a judicial determination and

declaration that it is entitled to inspect and copy NTA's books and records as set forth in Sections 5.02, 5.05, 5.06, and 5.08 of the General Agency Agreement and Section 5.04 of the Quota Share Agreement; that NTA is obligated to remit the difference between its provisional commissions and the adjusted commissions for agreement years 2017 through 2019; and any other rights and obligations under the General Agency Agreement and the Quota Share Agreement.

## PRAYER FOR RELIEF

**WHEREFORE,** in light of the foregoing, AntaresRe respectfully submits that judgment should be entered as follows:

1.      On the first cause of action, an order compelling specific performance of the requirements set forth in Sections 5.02, 5.05, 5.06, and 5.08 of the General Agency Agreement and Section 5.04 of the Quota Share Agreement;

2.      On the second cause of action, compensatory and general damages according to proof in a specific amount not yet ascertained, but in excess of the jurisdictional limit of this Court;

3.      On the third cause of action, an order compelling an accounting with respect to NTA's obligations under Section 2.01 of the General Agency Agreement;

4.      On the fourth cause of action, compensatory, general, and punitive damages according to proof in a specific amount not yet ascertained, but in excess of the jurisdictional limit of this Court;

5.      On the fifth cause of action, compensatory, general, and punitive damages according to proof in a specific amount not yet ascertained, but in excess of the jurisdictional limit of this Court;

6.      On the sixth cause of action, a judicial declaration as to the parties' rights and obligations under the General Agency Agreement and the Quota Share Agreement;

7.      For costs of suit incurred herein;

8.      For attorneys' fees incurred herein; and

9.      For such other and further relief as the Court deems just and proper.

Respectfully submitted,

_/s/ Jillian J. Keith_____

Jillian J. Keith
State Bar No. 24013671
Jillian.Keith@wilsonelser.com
**WILSON ELSER MOSKOWITZ
EDEMAN & DICKER, LLP**
901 Main Street, Suite 4800
Dallas, TX 75202-3758
(214) 698-8000 – Telephone
(214) 698-1101 – Facsimile

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was electronically filed with the Clerk of Court, via the CM/ECF Court Filing System, and was duly served upon all parties entitled to receive notice, in accordance with the Federal Rules of Civil Procedure, this 16th day of October, 2023.

_/s/  Jillian Keith_____

Attorney

COMPLAINT – PAGE 29

287718288v.4